IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| RAY ABRAHAM GARZA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:15cv175-CSC |
| | ) | (WO) |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

**I. Introduction**

On June 26, 2013, the plaintiff applied for disability insurance benefits pursuant to

Title II of the Social Security Act,  42 U.S.C. §§ 401 *et seq*., alleging that he was unable to

work because of a disability.  His application was denied at the initial administrative level.

The plaintiff then requested and received a hearing before Administrative Law Judge

("ALJ") Walter Lassiter, Jr..  Following the hearing, the ALJ also denied the claim.  The

Appeals Council rejected a subsequent request for review.  The ALJ's decision consequently

became the final decision of the Commissioner of Social Security (Commissioner).[2]  *See*

*Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  The case is now before the court for

review pursuant to 42 U.S.C. §§ 405 (g) and 1383(c)(3).  Pursuant to 28 U.S.C. § 636(c), the

---

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.

[2]  Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub. L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

parties have consented to entry of final judgment by the United States Magistrate Judge. Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be reversed and remanded to the Commissioner for an award of benefits.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A) a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination[3] the Commissioner employs a five-step, sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1)  Is the claimant presently unemployed?
> (2)  Is the claimant's impairment severe?
> (3)  Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4)  Is the claimant unable to perform his or  former occupation?
> (5)  Is the claimant unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

---

[3]  A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which supports the decision of the ALJ, but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III.  The Issues

**A.  Introduction.**  Garza was 31 years old on the date of onset. (R. 43).  He has a high school diploma and a college degree. (R. 43 & 57).  Garza's prior work experience includes work as a helicopter pilot, medical-service technician, and basic infantryman. (R.43).  Following the administrative hearing, the ALJ concluded that Garza has severe impairments of "post-traumatic stress disorder with comorbid major depressive disorder; depressive disorder, not otherwise specified versus adjustment disorder with anxious mood;

3

and depressive disorder, not otherwise specified; and sleep apnea." (R. 14).  The ALJ further

concluded that Garza's impairments or combination of impairments did not meet or

medically equal one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (R. 20-

22).  The ALJ found that Garza was unable to perform his past relevant work but concluded

that he

> has the residual functional capacity to perform light work as defined in 20 CFR
> 404.1567(b) except the claimant can frequently use his upper extremities for
> reaching overhead, pushing and pulling.  He has no additional limitation in the
> use of his upper extremities.  The claimant cannot climb ladders, ropes, poles
> or scaffolds. The claimant can frequently climb ramps and stairs.  He can
> frequently balance, stoop, kneel and crouch.  He cannot crawl.  The claimant
> can occasionally work while exposed to dusts, gases, odors and fumes.  The
> claimant cannot work in poorly ventilated areas.  The claimant cannot perform
> work activity at unprotected heights.  The claimant cannot perform work
> activity involving operating hazardous machinery.  The claimant can
> occasionally operate motorized vehicles.  The claimant is unable to perform
> work activities that require his response to rapid and/or frequent demands. The
> claimant can respond appropriately to supervision as well as perform work
> activity that requires only occasional supervision.  The claimant can
> occasionally interact with coworkers, so long as interaction is casual.  The
> claimant cannot perform work activity that requires interaction with the public.

(R. 23).

Using the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P., App. 2, as a

framework and relying on the testimony of a vocational expert, the ALJ concluded that there

were significant number of jobs in the national economy that the plaintiff could perform.  (R.

44).  Accordingly, the ALJ concluded that the plaintiff was not disabled.  (*Id*.).

**B.  Plaintiff's Claims.**  As stated by Garza, he presents three issues for the court's

review are as follows:

4

1.      The ALJ failed to properly evaluate the opinions from Plaintiff's treating psychologists.

2.      The ALJ failed to properly evaluate the opinion from examining source, Dr. King.

3.      The ALJ failed to given (sic) proper weight to the disability opinion of the Veterans Administration.

(Pl's Br. at 3-6).

## IV.  Discussion

This court's ultimate inquiry is whether the Commissioner's disability decision is supported by the proper legal standards and by substantial evidence. *See Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987).  "Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits."  *Sims v. Apfel*, 530 U.S. 103, 110-111 (2000).

> The SSA is perhaps the best example of an agency that is not based to a significant extent on the judicial model of decisionmaking.  It has replaced normal adversary procedure with an investigatory model, where it is the duty of the ALJ to investigate the facts and develop the arguments both for and against granting benefits; review by the Appeals Council is similarly broad. *Id*.  The regulations also make the nature of the SSA proceedings quite clear.  They expressly provide that the SSA "conducts the administrative review process in an informal, nonadversary manner."  20 C.F.R. § 404.900(b).

*Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000).

An ALJ must also state, with sufficient specificity, the reasons for his decision referencing the plaintiff's impairments.

> *Any* such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such

5

individual *shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.*

42 U.S.C. § 405(b)(1) (emphases added).

An ALJ is not free to simply ignore medical evidence, nor may he pick and choose between the records selecting those portions which support his ultimate conclusion without articulating specific, well supported reasons for crediting some evidence while discrediting other evidence. *Marbury v. Sullivan*, 957 F.2d 837, 839-41 (11th Cir. 1992). The court pretermits discussion of Garza's specific arguments because the court concludes that the ALJ erred as a matter of law, and, that this case is due to be remanded for an award of benefits.

The problem with the ALJ's analysis can be succinctly stated. The ALJ's level of hostility towards Garza prevented the ALJ from being an impartial decisionmaker, and Garza was prejudiced by the ALJ's failure to provide him a fair, full and unbiased evaluation of his claim. A claimant is entitled to a hearing that is both full and fair. *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Jarrett v. Comm'r of Soc. Sec.*, 422 F. App'x 869, 874 (11th Cir. 2011). Garza is entitled to "an unbiased evaluation" of his claim by an impartial decisionmaker. *Miles, supra*. "The right to trial by an impartial decisionmaker is a basic requirement of due process." *Keith v. Massanari*, 17 F. App'x 478, 481 (7th Cir. 2001). *See also Ventura v. Shalala*, 55 F.3d 900, 902 (3rd Cir. 1995) ("Essential to a fair hearing is the right to an unbiased judge."). Because the ALJ plays a crucial role in the administrative review process for disability claims, "[t]he impartiality of the ALJ is thus integral to the

6

integrity of the system." *Id.*, at 1401 citing *Johnson v. Mississippi*, 403 U.S. 212, 216 (1971). Moreover, the regulations direct that "[a]n administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision." 20 C.F.R. ¶ 404.940. *See also Miles,* 84 F.3d at 1400.

> Although an administrative adjudicator is presumed to be unbiased, *see Schweiker v. McClure,* 456 U.S. 188, 195, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982), this presumption can be rebutted by showing that the ALJ "displayed deep-seated and unequivocal antagonism that would render a fair judgment impossible.

*Keith*, 17 F. App'x at 481 *quoting Liteky v. United States*, 510 U.S. 540, 556 (1994).

Garza suffers from PTSD as a result of a deployment to Afghanistan, and he uses a service dog to assist him with coping. Despite extensive medical evidence, the ALJ opined that he doubted that Garza even suffers from PTSD.

> Quite candidly, the undersigned questions his need of the dog and even the existence/severity of the claimant's diagnosis of PTSD (see discussion below, the specific cause of his PTSD is not at all clear).

(R. 21)

The ALJ's bias and hostility is apparent from his opinion and the colloquies that occurred at the hearing. A review of the administrative hearing transcript reveals the following interaction between the ALJ and the plaintiff.

> Q:   How did you attend college?
>
> A:   I took a couple of classes, they were actual on Fort Rucker when I enlisted and after that it was on-line courses.
>
> Q:   And through which university?

7

A:      Troy University, the majority of it.

Q:      With a B.S. in psychology?

A:      Correct.

Q:      And were you required to attend any classes in person?

A:      I did for my last three classes.  The Army – I came back from deployment, I had three months to finish my degree or I would have been thrown out of the Army.  So I was released through the completion program.  I went to Troy University, finished up the three courses I had left.

Q:      Where?

A:      Troy main campus and Troy Dothan campus.

Q:      All right.  And when did you complete those three classes?

A:      It was December of 2011, Your Honor.

Q:      Unless I'm missing my math, you completed those in-person courses after – at least one or two of them after you reported you became disabled.

A:      Yes, sir.

Q:      So clearly at that time you were not homebound?

A:      At that time, no.

Q:      So what happened between the time you completed the courses and the time you became homebound that caused you suddenly to be able to finish school, finish a Bachelor's Degree in psychology, but then within whatever period unable to leave the house without assistance?

A:      To leave the house without assistance, well, everything just got worse, Your Honor.

Q:     Isn't it kind of interesting that everything got worse after you completed your Bachelor's Degree in psychology? Isn't that kind of interesting?

A:     Not really, Your Honor, because while I was in school, the only reason I graduated was because those professors understood what I was going through with my diagnosis of PTSD.

Q:     What does that have to do with interacting on campus, interacting with other students, getting to and from the campus?

A:     Because I didn't have to go to class.

Q:     That's not what you told me a minute ago.

A:     That I started out that way, yes, and then it continued through November. But those last six weeks, I didn't have to go to class.

Q:     Did you tell me that a moment ago?

A:     No, Your Honor.

Q:     It's awfully convenient now, isn't it? Okay. . . .

(R. 59-61).

Thereafter, the ALJ asked Garza about the consultative evaluation and his deployment.

Q:     Tell me why you think it is based on your education, why the consultant that we sent you to see declined to confirm your PTSD?

A:     That I don't know, Your Honor. I do not know. I spoke to her for 45 minutes. We were interrupted. According to her, I have tattoos on my knuckles, I don't have a degree, I was never in combat. And why she says that I don't have PTSD, I'm not sure. We discussed the majority of the time my family and home life, what it was like growing up for me, and we briefly touched on Afghanistan.

9

Q:      And what happened in Afghanistan?

A:      Essentially there are three traumas.  A friend of mine, his Apache helicopter was shot down.

        Another guy that I was working medevac missions, I got to know Corporal Waterwitz (phonetic) over three weeks.  Two days after I left where we were, Bala Morgab, I was on night shift and I got called on a hero mission where we go and we pick up the fallen to get them ready to come home.  When I got there, the other marines, they recognized me and they told me who – told me who it was and I had to bring him home.

        And the first one that occurred was a little boy that I watched die in his father's arms.

Q:      That's it?

A:      Yes, sir.

Q:      And none of these things stopped you from completing your degree in psychology.  What was your GPA like?

(R. 63-64).

In his opinion, the ALJ relies solely on the consultative examiner's report to conclude that Garza was not a combat veteran and to discount the effects of these traumas.  The ALJ's lack of sensitivity to and respect for the plaintiff's military service in Afghanistan is apparent.

Though the claimant was stationed in a combat zone, it does not appear that he was personally involved in combat (Exhibit 8F). There is no evidence that the alleged events took place in his presence.  The claimant did not know about the corporal's death until he went to pick up the bodies of fallen soldiers (Testimony).  In the case of the little boy's death, the claimant had been watching video feed taken by a drone, which showed a man planting a landmine (IED). It appears that a white van drove over the landmine, killing or injuring its occupants, including a child.  The child later died at the hospital (Exhibit 3F, pages 16, 22; 11F, page 174).  *These events are not what one*

10

> *would consider extreme stressors.  To the contrary, these events are what one would expect to find in a war zone.  In fact, these events are not significantly different from those commonly experienced by civilians (i.e. death of friend or child in a car accident)*.  The undersigned notes here, that the claimant had trained as a medic; and, prior to 2007, he had been a laboratory technician and performed over fifty autopsies as part of his job (Exhibit 8F, page 4; Exhibit 11F, page 159).  *His extensive medical and military training would have helped to desensitize these types of events*.  The undersigned notes, with particularity, that Dr. King could not determine whether or not the claimant had PTSD based on his reports and his presentation during her evaluation and she clearly concluded with some limitation, the claimant is able to address his own activities of daily living as well as some work activity (Exhibit 8F).

(R. 31) (emphasis added).

Not only was the ALJ's reliance on Dr. King's opinion erroneous, his comments about the effects of traumatic events illustrate his antagonistic attitude towards the plaintiff as well as a lack of understanding about living and working in a combat zone.  Survival in a combat zone requires constant vigilance.  There is little or no respite from the stress that causes.  The ALJ's attempt to diminish the effects of the three events described by Garza shows a callous indifference to the impact on our veterans of an environment about which the ALJ obviously has no understanding.

A showing of prejudice "at least requires a showing that the ALJ did not have all of the relevant evidence before him, or that the ALJ did not consider all of the evidence in the record in reaching his decision."  *Kelley v. Heckler*, 761 F.2d 1538, 1540 (11th Cir. 1991).  In this case, the ALJ did not consider all the evidence before him and demonstrated antagonism towards the plaintiff, thereby prejudicing Garza.

In his initial application for disability benefits, Garza alleged that he was disabled due

11

to PTSD and Major Depressive Disorder. (R. 86).  While in the United States Army, Garza

served as a Blackhawk Helicopter pilot, a medical lab technician, and a combat medic.  (R.

98).  Relying on Dr. King's evaluation, the ALJ concluded that Garza was not involved in

combat and determined that he was "a liaison to NATO" while in Afghanistan.

> The record does show that the claimant served one tour of duty in Afghanistan
> from June 2010 to June 2011.  His primary duties appear to have been
> supervisory in nature.  He was a liaison to NATO.  His military occupation
> speciality was in aircraft power plant repair. He was responsible for a battalion
> of forty-five soldiers and ten helicopters.  He lost none of his men (Exhibit
> 8F).

(R. 31).

However, this information which came from Dr. King is only partially accurate and

the ALJ ignores other evidence in the record that demonstrates that Garza flew combat

missions while deployed.  For example, on his work history, Garza stated that he was the

> sole aviation liaison to NATO, working 22+ hrs/day for 90 days, planning joint
> missions, assaults, tracking data, Personnel, and casualty reports in real-time,
> all while constantly under the threat of Indirect/direct mortar fire, IED
> explosions, sniper fire, enemy insurgent RPG, Anti-Aircraft, small arms, and
> machine gun fire.  ***For the remaining 10 months of my deployment, I flew
> helicopters into hostile areas, under all weather conditions, during day or
> night-times, always under direct threat from a determined Insurgent threat***.
> . . .  ***When flying, I flew 8-12 hours at a time, without bathroom breaks or
> rest, always carrying 125 lbs + of gear in an aircraft with no heat or a/c***. . .

(R. 221, 232) (emphasis added)

Garza's records are replete with references that he served as a Blackhawk helicopter

pilot in combat in Afghanistan.  (R. 186, 198, 214, 215, 225, 228, 232, 283, 479, 525-26, 655

& 701).  The record also reveals that Garza has been awarded the following medals and

decorations:  Bronze Star, Air Medal, Army Commendation Medal, Valorous Unit Emblem, Army Good Conduct Medal, National Defense Service Medal, Afghanistan Campaign Medal - Campaign Star, Global War on Terrorism Medal, NCO Professional Development Ribbon, Army Service Ribbon, Overseas Service Ribbon, and NATO Medal.  (R. 282).

A review of Garza's military medical records demonstrates that the ALJ is simply wrong about many things.  The ALJ failed to consider the progressive deterioration of Garza's mental health.  Garza was stationed in Fort Hood, Texas in June 2010 when he was cleared medically for deployment.  (R. 820, 824-8269).  He was deployed from June 2010 to June 2011 to Afghanistan.  Prior to his deployment, he had no complaints of depression or other PTSD symptoms. (R. 825, 828, 849, 856, 861, 865, 869, 881 & 892).

On October 11, 2011, Garza was referred by his flight surgeon to the Psychology Clinic for an aeromedical psychological evaluation.  (R. 814).  Garza presented to the clinic with deployment related combat stress reaction.  (*Id*.)

> SM (Service Member) complains since returning from deployment he has experienced significant anhedonia, amotivation, and problems concentrating on school.  SM also reports irritable mood, impatient attitude around civilians, hypervigilance, startle and social withdrawal.  SM states that he would rather be deployed and feels uncomfortable around people - which interferes with his school work.  SM states that he carries a firearm everywhere he goes and sleeps with his firearm in order to feel safe. SM states that he has not sslept (sic) more than 2-3 hours since the Ft. Hood shooting and has felt extremely hypoviligant since the incident in 2009.  SM is not currently flying. . . . SM was educated on treatment options and will consider psychiatric medications and has been referred to psychiatrist.

(R. 814).

Garza reported "deployment related adjustmetn (sic) difficulties to sudden lifestyle change - e.g. deployed to college student." (R. 815). Garza was referred for a psychiatric consultation and psychotherapy. (*Id.*)

Garza returned to the Psychology Clinic on October 18, 2011 for psychotherapy. At that time, he reported sleeping better, doing better at school and being more focused.(R. 811). Garza was "educated on adjustments expected when returning from a battle zone." (*Id.*)

> SM reports that he recognizes the extreme difference experienced when he left his unit and started going to college. SM recognized the extreme need to controll (sic) his environment that was normal in a combat zone but causes relationship problems in garrison. SM recognizes the "let down" he experienced from being in command to being a college student. SM continues to educate himself on his adjustment. SM will f/u with Dr. Ferrell to consult on meds.

(R. 811).

On October 25, 2011, Garza presented to the Primary Care Clinic at Fort Rucker to secure a medical certificate. (R. 809). He was disqualified from flying due to depression and generalized anxiety disorder. (*Id.*). A screening examination demonstrated that Garza was positive for depression and PTSD. (*Id.*) Garza reported feeling "safe at home." (R. 808, 810).

On October 31, 2011, Dr. Wyatt, a licensed psychologist, opined that Garza was suffering from Reaction to Chronic Stress. (R. 805). On November 1, 2011, psychiatrist Madeline Ferrell evaluated Garza for combat-related stress at the request of Dr. Wyatt. (R. 803). Dr. Ferrell prescribed Zoloft for his core PTSD symptoms, Depakote for his anger and

14

irritability and Trazodone to help him sleep. (*Id.*).

Dr. Wyatt next saw Garza on November 9, 2011. (R. 802). At that time, Garza reported "feeling in better mood since starting zoloft and trazodone/ambien." (*Id.*). On November 15, 2011, Garza saw Dr. Ferrell for a medication checkup. At that time, he was doing better on Zoloft and Depakote. (R. 801).

On January 17, 2012, Garza participated in counseling with Dr. Wyatt. (R. 800). At that time, Garza's mood was improved and he was less irritable. Dr. Wyatt also introduced Garza to Cognitive Behavior Therapy principles. (*Id.*). During counseling on February 7, 2012, Garza discussed cognitive processing therapy theories with Dr. Wyatt. (R. 799). Garza also saw Dr. Ferrell for medication management. (R. 797).

On March 8, 2012, Garza presented to Dr. Ferrell for medication management. (R.793). She reconciled his psychotropic medications with his other prescribed medications. (*Id.*). On March 27, 2012, Garza participated in counseling with Dr. Wyatt. He continued to work on cognitive behavioral therapy for anxiety and mood management. (R. 791).

On April 9, 2012, Garza presented to Dr. Ferrell. He was seeking to be restored to flight status and had discontinued one of his medications. (R. 789). Dr. Ferrell diagnosed Garza with Post-Traumatic Stress Disorder and adjusted his medications. (R.789-90). On May 21, 2012, Garza had discontinued taking Trileptal and Prazosin and tolerated an increase in the Zoloft dosage. (R.786). He was still waiting for a flight waiver. (*Id.*). Dr. Ferrell noted that Garza was compliant with treatment. (*Id.*)

15

On June 25, 2012, Garza presented to Dr. Wyatt seeking a waiver to permit him to return to flying. (R. 785). Dr. Wyatt noted that Dr. Ferrell had diagnosed Garza with PTSD, and he changed his diagnosis to correspond to hers.[4]  (*Id*.).  On July 12, 2012, Garza underwent personality testing administered by Dr. Wyatt. (R. 774-75). Dr. Wyatt opined that

> SM does not suffer a psychiatric disorder that currently will impair him from performing aviation duties safely.  Validity scores indicated that SM responded in a forthright manner - no indication of over-reporting, under-reporting, inattentive, inconsistent, or idiosyncratic responses on validity scales (PIM = 50).  However on clinical scales and supplemental scales there was mild suggestion that SM tended to view himself in an overly optimistic manner. SM elevated MAN (T=77) and MAN-G (T=86) which is correlated with narcissistic personality traits and optimistic attitudes.  SM IS OBVIOUSLY NOTE IN A MANIC STATE.  Defensiveness index (T=76) and Cashel Discriminant Function (T=75) were elevated suggesting Sm's responses were more similar to test subjects attempting to portray themselves in a positive light than to normal test subjects.

(R. 774-75).

Dr. Wyatt opined that Garza was not currently suffering from "a psychiatric disorder that is incompatible with aviation duties" at that time.  Dr. Wyatt opined that Garza could safely execute aviation duties. (R.775).  Nonetheless, Dr. Wyatt did not change Garza's diagnosis of PTSD.

On August 6, 2012, Garza was seen by Dr. Ferrell for a routine medication check. (R.

---

[4]  The ALJ makes much of the fact that Garza was initially diagnosed with "reaction to chronic stress" and not with PTSD.  He stated that Garza's "diagnosis was changed to PTSD to comply with the new Office of the Surgeon General (OTSG) guidelines" implying that Garza did not suffer from PTSD. (R. 32). Dr. Wyatt, the licensed psychologist, noted in his treatment note that he changed his diagnosis to correspond to psychiatrist Dr. Ferrell's diagnosis of PTSD.  (R. 785).  However, there is no indication that Garza was diagnosed by Dr. Ferrell with PTSD simply to meet guidelines. The ALJ's inference is unfounded speculation.

762).  At that time, Garza had "tapered and discontinued all psychotropic medications except Zoloft (150 mg daily) for which he can receive a waiver."  (*Id*.).  Garza informed Dr. Ferrell that he was being stationed at Fort Campbell, Kentucky and he was pleased with the assignment.  (R. 762).  Dr. Ferrell instructed Garza to "become established with Mental Health at Fort Campbell."  (R.763).

On November 5, 2012, Garza presented to the Flight Medicine Clinic at Fort Campbell, Kentucky for a flight physical.  (R. 744-48).  He was again seeking flight waivers. (*Id*.)  Garza was referred to Behavioral Health Clinic. (R. 742 & 747).  On November 30, 2012, Garza underwent a psychiatric evaluation by psychiatrist Dr. Ashley Chatigny.  (R. 723-25).  Dr, Chatigny noted that Garza's OQ45[5] result score was 65 and she noted that "a score of 63 or more indicates symptoms of clinical significance."  (R. 724).  She also noted that his Symptom Distress and Social Role scores were high enough to indicate symptoms of clinical significance.  (*Id*.)  Dr. Chatigny confirmed Garza's diagnosis of PTSD and altered his medications.  She indicated that Garza would have to participate in psychotherapy and be stable in order to return to flight status.  (R.725).

On December 5, 2012, Garza was seen by Dr. Timothy Carbary, a licensed Neuropsychologist/Aeromedical Psychologist. (R. 719-22), Dr. Carbary noted that Garza's OQ45 score had increased to 74.  (R.721).  Garza was referred to Dr. Carbary for an aeromedical neuropsychological evaluation at the request of the flight surgeon, Dr. John

---

[5] The Outcome Questionnaire OQ45 is a psychological assessment that measures a patient's current mental health status.

Shields.  (*Id.*).  Dr. Shields requested the evaluation for the following reason.

> SM 33YO aviator, 03, was at Rucker for a year and RX for a year with Zoloft.
> Waiver never applied for.  Now PCS to Campbell with continued Zoloft.  Is
> Aviator.  Has been DNIF [Duty Not Involving Flying] for a year.  Unclear if
> this is correct DX.  Unclear if SM needs to remain on Zoloft.  *Unclear if this
> SM can be waivered*.  Tim, Could you please see, assess, DX, RX as
> appropriate.

(R. 721) (emphasis added).

Following his assessment, Dr. Carbary suggested an off-post psychotherapist.  (R.
722).

On December 12, 2012, Garza presented to Dr. Chatigny complaining of poor sleep,
and hypervigilance.  (R. 715).  Dr. Chatigny confirmed his PTSD diagnosis, and also
diagnosed him with Adjustment Disorder with Anxious Mood.  (R. 714-15).  Dr. Chatigny
continued his prescription medications, and added a prescription for Trazadone. (R. 716).

Garza next saw Dr. Chatigny on December 28, 2012 and reported that he had "not
been doing well."  (R. 695).  He complained of depression, irritability, increased stress,
anxiety and insomnia.  (*Id*.)  Dr. Chatigny again diagnosed Garza with PTSD "related to past
deployment" and with involutional melancholia (MDD) mild.  (*Id*.)  She increased his
medications.  (R. 696).

On January 17, 2013, Garza presented to Dr. Chatigny for therapy.  (R. 674-76).  At
that time, his OQ45 score had increased from 74 in December 2012 to 83.  (R. 674).  His
mood was depressed and his affect was restricted. (R. 676).

On February 12, 2013, Garza was seen at the medical clinic for a follow-up regarding

18

his fatty liver and a sleep study.  (R. 647-53).  While Garza was tolerating a CPAP machine for his sleep apnea, Garza's answers to PTSD questionnaires again indicated positive for PTSD.  (R. 651).  Dr. Strobel, a flight surgeon, noted that Garza continued to suffer from nightmares despite medication.  He opined that "[t]his might become a MEB[6] diagnosis if continued symptoms unaffected with daily activities and work."  (*Id*.)

On February 26, 2013, Garza presented to Dr. Chatigny with the complaint that he was "still having trouble."  (R. 632-35).  His OQ45 score had increased again from 83 to 91.  Although he was in no acute distress, his mood was depressed and his affect was restricted.  (R. 634).  Dr. Chatigny noted that a medical retirement should be considered.  (R. 635).

The ALJ does not reference Dr. Strobel or Dr. Chatigny's recommendations that Garza be retired from the military for medical reasons.  Rather, the ALJ erroneously speculates that Garza's

> sudden increase in symptoms after [his] transfer [is] suspect in light of his successful treatment at Fort Rucker.  The overall record suggests, that once he finished college and his Captain's Career Course, he decided to leave the Army and with a military retirement.

(R. 33).

This finding is gross speculation with no basis in fact.  In 2012, Garza informed Dr. Ferrell that he was being stationed at Fort Campbell and he was pleased with the assignment.  (R. 762). In addition, the medical records demonstrate that Garza repeatedly attempted to

---

[6]  A MEB diagnosis would refer Garza to the Medical Evaluation Board for a military medical retirement from active duty.

taper off his prescribed medications so that he could obtain a flight waiver and return to flying helicopters. (R. 744-48, 762, 785-86, 789, 809). The ALJ also completely ignores the evidence in the record that medical professionals, and not Garza, initiated his retirement. This is yet another example of the ALJ's antagonism and hostility to Garza.

On March 6, 2013, Garza contacted the health clinic to discuss his referral to behavioral therapy. "[Patient] states he is seeing BH for the last year, does not understand why he needs another referral." (R. 619). Garza was referred for consultation to Behavioral Health. (*Id*.) However, Dr. Strobel noted that Garza had

> signs and symptoms consistent with PTSD. Review of medical records identifies possible poorly-controlled PTSD symptoms. Have consulted neuro behavioral psychologist Dr. Carbary for evaluation, discussing with immediate supervisor, and providing recommendations for potential MEB/WTU placement.

(*Id*.)

Dr. Strobel's primary diagnosis was Post-traumatic stress disorder. (*Id*.) Dr. Strobel saw Garza again on March 14, 2013. (R. 602-08). At that time, Dr. Strobel observed that Garza exhibited "[s]igns and symptoms of continued PTSD requiring multiple central acting medication," [and] "continued PTSD symptom associated anxiety." (R. 605). Screening was positive for PTSD and depression. (R. 606).

On March 20, 2013, Dr. Chatigny discussed a medical retirement with Garza. (R. 597). Garza's current medications included Effexor, Zonegran, Vistaril, Wellbutrin, Minipress and Buspar. (R. 598). His mood was depressed and his affect was restricted.

(*Id*.).  Dr. Chatigny noted that Garza was

> having exaserbation (sic) of depression after having a baseline depressed mood for some time.  Increased psychosocial stressors are contributing to TX resistance. Continue meds as above.  Consider start buspar for anxiety 7.5 mb bid.  Consider abilify. Pt in therapy at vandi he is going through some trauma work.

(R. 599).

Finally, Dr. Chatigny opined that Garza did "not meet medical retention" requirements and recommended that he proceed with a medical retirement.  (*Id*.)

On March 21, 2013, a notation from the Mental Health Clinic revealed that Garza had symptoms of "little interest, feeling depressed, difficulty sleeping, and difficulty concentrating."  (R. 595). He also had PTSD symptoms of "reliving, avoidance and hypervigilance." (R. 596).

Dr. Chatigny next saw Garza on April 1, 2013 for psychotherapy.  (R. 585-87).  At that time, Garza's OQ45 score had increased from 91 to 112 which is considered clinically significant.  (R. 587).  Dr. Chatigny's treatment note is as follows.

> Pt is going through trauma focused therapy off post. He is having a (sic) exaserbation (sic) of his symptoms secondary to this.  Called his therapist at Vanderbilt and spoke with her about it.  She is aware and will keep this provider informed.  Pt decreased visteril secondary to heart palpitations. Continue Effexor XR 225 mg, zonegran 100mg, Wellbutrin XR 150mg, minipress 5 mg and buspar 7.5mg bid.  Pt continues to have hyperviligance, melancholia with SI (no plan) and nightmares daily. Pt to increase minipress today to 7mg and will add serqouel 25-100mg qhs prn insomnia. f/u in 2-4 weeks or sooner if needed.
> Disp: MEB

(R. 587).

Despite these recent treatment notes and the recommendation that Garza be retired medically from the military, the ALJ gave great to Dr. Chatigny's opinions because according to the ALJ, Dr. Chatigny found "that the claimant has no more than mild to moderate symptoms or mild to moderate impairment in his social and occupational functioning."  (R. 40).  This finding is not supported by the medical evidence, and it is refuted by Dr. Chatigny's recommendation that Garza be referred to MEB for a medical retirement from the Army.  (R. 599).

On April 1, 2013, Dr. Michelle Rorie of the Medical Evaluation Board ("MEB") saw Garza for a military physical medical evaluation for the MEB and conducted a "fitness for duty" examination.  (R. 583-84).  Dr. Rorie interviewed Garza and reviewed his medical records.  (*Id*.)  Dr. Rorie's provisional diagnoses were "MDD [major depressive disorder], severe with resistence to treatment and PTSD, moderate to severe."  (R. 583).  She noted that Garza "can not do his job.  [H]e is very symptomatic with avoidance, melancholia and anxiety.  He does not meet medical retention."  (*Id*.)

> S:   33 yo AD male with MOS 15B–UH-60 Helicopter Pilot/Unit Air Movement Officer referred to MEB due to Major Depressive and Post Traumatic Stress Disorder. Interview with soldier and review of AHLTA notes indicates symptoms began in 2011.  Soldier was first seen in regards to his MEB condition on 11 Oct 11 with ABH on referral from flight surgeon Sallis for an Aeromedical psychiatric evaluation due to combat related stress. Soldier had recently returned from deployment to Afghanistan and was completing his degree as a full time student.  He reported loss of motivation, poor concentration, irritable mood, startle response, hyperviligence (sic), impatience around civilians, and feeling uncomfortable around people.  Soldier reported taking his gun everywhere and sleeping with his firearm in order to feel safe since the Ft. Hood shootings.  Soldier had routine labwork drawn and

had a comprehensive psychiatric evaluation. He was recommended for continued psychotherapy. This occurred in a deployment or garrison setting. 01 Nov 11 soldier saw ABH and was prescribed Trazodone for sleep, Zoloft for core PTSD, and Depakote ER for anger/irritability. 07 Feb 12 solder saw ABH and was doing well with mood stabilization except that he reported a 72 pound weight gain since starting Depakote and Zoloft. Soldier was weaned off of Depakote and started on Trileptal. He was continued on Zoloft. 08 Mar 12 soldier saw ABH for follow up and reported an improvement in his irritability and a 10 pound with (sic) loss with the medication adjustment. 09 Apr 12 soldier saw ABH and was doing well but requested a taper off of his Trileptal in order to regain flight status. He was diagnosed with Post Traumatic Stress Disorder and was given taper instructions for Trileptal while increasing Zoloft. 06 Aug 12 soldier saw ABH prior to transfer for Ft. Campbell and was doing well. 30 Nov. 12 soldier saw ABH at Ft. Campbell and reported continued symptoms including fatigue, hypervligence, insomnia, and social isolation. He also reported depressed mood. Soldier's Zoloft was cross tapered to Effexor XR and Zonegran was started for mood stabilization and to assist in weight loss. 05 Dec 12 soldier saw Aeromedical Neuropsychology for assessment IAW. 28 Dec 12 soldier saw ABH and reported increased depressive symptoms over the holidays. 12 Feb 13 soldier saw his PCM and MEB was a consideration due to his continued PTSD symptoms. He reached MRDP on 20 Mar 13 when ABH consulted MEB.

(R. 584).

Dr. Rorie opined that Garza suffers from Major Depressive Disorder and Post Traumatic Stress Disorder at levels that are medically unacceptable for military service. (*Id*.). On April 3, 2013, Dr. Rorie completed a physical profile on Garza. (R. 265). She again opined that Garza did not meet the retention standards of the Army and that he needed to be referred to the Medical Review Board. She also indicated that he should have no weapons or ammunition. (*Id*.). Dr. David Twillie approved her recommendation. (*Id*.)

In addition, on April 1, 2013, Garza's commanding officer completed a Performance and Functional Statement. (R. 266-70). His commanding officer noted that Garza could not

23

perform his duties and did not recommend retaining him.

> [Service Member's] PTSD and MDD hinders performance through occupational and social impairment.  His abilities to concentrate, multitask, make decisions, to recollect instructions, and to follow direction has diminished significantly over the past three months.  When this Officer first arrived at the Unit, he was capable of handling all tasks required of his duty position.  Since then, however, his abilities to do so have decreased.  He can no longer concentrate long enough to complete any task given to him, nor is he able to establish and maintain effective interpersonal work relationships with peers.  SM also displays extreme mood swings, displaying guilt, sadness, and tears one minute, while gravitating towards anger, irritability, and impulsiveness the next.

(R. 267).

Garza's commanding officer further opined that Garza could not perform "General Staff Officer Duties, Aviator Duties, Assistant S-3 Tasks, [or] Unit Air Movement Planning Duties."  (R. 268).  Despite these observations from his commanding officer, the ALJ concluded that "[t]he record is wholly void of any evidence or objective note of failed functioning while interacting with others."  (R. 21).  This finding in not supported by any evidence, and the ALJ completely ignores Garza's medical military records contained within Exhibit 1F.

On April 23, 2015, Dr. Aileen McAlister completed a Compensation and Pension Exam Report of Garza.  (R. 274-300).  Dr. McAlister stated that she reviewed Garza's medical records and his claim file, and she specifically listed all the medical records she reviewed beginning in 2008 and ending on April 12, 2013. (R. 274-278).  Dr. McAlister also interviewed Garza.  (R. 280).  Garza provided Dr. McAlister with a letter from his

psychiatrist Dr. Deborah Tyson.

Dr. McAlister noted that Garza's reports of the deterioration of his PTSD symptoms were documented in and consistent with his medical records. (R. 292). Dr. McAlister opined that Garza met the DSM-IV criteria for a diagnosis of PTSD. (R. 295). She diagnosed him with PTSD, delayed onset, now chronic, and Major Depressive Disorder, . . . due to PTSD. (*Id.*). The ALJ gave little weight to the opinion of Dr. McAlister because "Dr. McAlister performed a one-time psychiatric evaluation"[7] and she "relied heavily on Dr. Tyson's opinion to show there was a delay in claimant's PTSD symptoms." (R. 41). While Dr. McAlister noted Dr. Tyson's letter in her assessment, there is no indication in her report that she relied solely or heavily on her letter. *See* R. 281. This finding by the ALJ is not supported by the record, and thus, his reasons for discounting her opinion are not supported by substantial evidence.

On June 26, 2013, Garza was transferred to the Warrior Transition Unit for treatment and evaluation of his PTSD. (R. 516). It was recommended that a service dog be provided to Garza for added support and to decrease his PTSD and anxiety symptoms. (R. 518).

On July 10, 2013, Garza began seeing Dr. Sandya Gunasekera. (R.477-81). After an evaluation, Dr. Gunasekera noted that Garza was anxious and diagnosed him with PTSD. (R. 480). He continued Garza on Wellbutrin, Effexor, and Buspar. (*Id.*) Garza was seen by Dr. Gunasekera on July 24, 2013, (R. 461-65), August 12, 2013, (R. 420-24), and September

---

[7] Ironically, the ALJ gave Dr. King's opinion "significant weight" despite the fact that she also conducted a "one-time psychiatric evaluation."

11, 2013.  (R. 396-401).  Interestingly, many of Dr. Gunasekera's notes are identical for each visit except for the change in medication.  The ALJ gave "great weight" to the opinion of Dr. Gunasekera because "as shown by [his] GAF assessments, [] the claimant has no more than mild or moderate symptoms."  (R. 40).  With respect to Dr. Gunasekera, the ALJ relies on a GAF score of 60 noted on his treatment record of July 10, 2013.  The ALJ's reliance is misplaced.  There is no explanation as to how Dr. Gunasekera determined that score but more importantly, nowhere in Dr. Gunasekera's notes does he indicate that Garza's symptoms are mild or moderate.

On May 28, 2013, the Medical Evaluation Board found that Garza was "unfit to continue military service" due to "Posttraumatic stress disorder w/ comorbid major depressive disorder."  (R. 303).  Because the Army determined that Garza was unfit for military duty, he was referred to the Department of Veterans Affairs for a disability assessment. (R. 1260).  He was recommended for 100% disability due to posttraumatic stress disorder with major depressive disorder. (R. 1261).  On September 12, 2013, the Department of Veterans Affairs ("VA") issued a decision awarding Garza 100 % disability based on posttraumatic stress disorder with major depressive disorder and awarding him benefits.  (R. 1277-85).

The ALJ gave "some weight to the military Medical Evaluation Board's "Medical Retention Determination Point (MRDP)" statement" and did not specify the weight he gave to the Veterans Administration's disability rating.  (R. 40 & 42).  According to the ALJ

> [T]he Department of Veterans Affairs found claimant's PTSD 100% disabling based on Dr. McAlister's evaluation and her GAF assessment of 50 on April 23, 2013 (Exhibit 9F, page 3). It does not appear that the Department of Veterans Affairs performed their own mental evaluation nor does it appear that they reviewed claimant's military medical records authored by Drs. Chatigny, Gunasekera, and Griffins, which indicate that his overall PTSD symptoms and functioning were mild to moderate in severity.

(R. 42).

In its decision, the VA listed the evidence it relied on to reach its decision. *See* R. 1277-78. The ALJ is simply wrong with respect to the review of the medical records. In listing the evidence reviewed, the VA specifically reviewed Garza's "[s]ervice treatment records, period of service from April 1999 through April 2013" which would include Dr. Chatigny's records. (R. 1277). In addition, as previously pointed out, the ALJ ignored Dr. Chatigny's records that did not support his determination that Garza's symptoms were "mild to moderate in severity."

"Generally, '[t]he findings of disability by another agency, although not binding on the Secretary, are entitled to great weight.'" *See Falcon v. Heckler*, 732 F.2d 827, 831 (11th Cir. 1984) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983). *See also Brady v. Heckler*, 724 F.2d 914, 921 (11th Cir. 1984) ("Although the [VA]'s disability rating is not binding on the [Commissioner], it is evidence that should be given great weight."). Thus, the court concludes that the ALJ's reasons for discounting the findings of the MEB and the VA are not supported by substantial evidence.

The court now turns to the ALJ's reliance on Dr. King to conclude that Garza has "no

more than moderate impairments." (R. 40). Again, his reliance is misplaced. First, the court notes that much of Dr. King's history, which the ALJ accepted as true, is contradicted by the evidence. For example, Dr. King noted that Garza had "a number of tattoos on his knuckles," and "[h]is military occupation speciality was an in aircraft power plant repair according to the records." (R. 1287). Garza denied any tattoos on his knuckles (which would have been apparent to the ALJ at the administrative hearing), and all of Garza's military records list his occupational speciality as UH-60 Blackhawk helicopter pilot. Furthermore, Dr. King stated that Garza "did not see combat." (R. 1287). She was simply wrong but the ALJ treated her historical recitation as true and accurate. Finally, the ALJ emphasized Dr. King's statement that she could "neither confirm nor disconfirm the validity of [his PTSD] diagnosis" in his opinion. (R. 30). The ALJ also questioned Garza at the administrative hearing about Dr. King's failure to confirm his PTSD diagnosis. (R. 63). The ALJ's selection of a single statement again illustrates his antagonism to Garza. Dr. King's summary is as follows.

> This individual presents with symptoms of depressed mood, particularly irritability and sleep issues. . . . Other medical records have given him the diagnosis of PTSD. This examiner could neither confirm nor disconfirm the validity of that diagnosis. Based on medical records and the patient's interview today, he is judged to have a mild to moderate restriction of activities, a mild to moderate constriction of interests, and moderate impairment in his ability to relate to others. He would be able to function independently and takes (sic) care of his basic physical needs. ***Once his depression stabilizes***, he would be able to understand, carry out, and remember simple to complex instructions. ***He may have some difficulty responding appropriately to supervisors and co-workers per his report*** and would do best in a supportive work environment in which he can primarily work alone.

28

(R. 1291).

Dr. King conditions Garza's ability to work on the stabilization of his depression which the ALJ ignores.

The law in this circuit is well-settled that the ALJ must accord "substantial weight" or "considerable weight" to the opinion, diagnosis, and medical evidence of the claimant's treating physicians unless good cause exists for not doing so. *Jones v. Bowen,* 810 F.2d 1001, 1005 (11th Cir. 1986); *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985). The Commissioner, as reflected in his regulations, also demonstrates a similar preference for the opinion of treating physicians.

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultive examinations or brief hospitalizations.

*Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 CFR § 404.1527 (d)(2)). It is not only legally relevant but unquestionably logical that the opinions, diagnosis, and medical evidence of a treating physician whose familiarity with the patient's injuries, course of treatment, and responses over a considerable length of time, should be given considerable weight.

First, as previously mentioned, one of Garza's treating physicians, Dr. Strobel, recognized that Garza was suffering from poorly managed PTSD. Dr. Strobel recommended that Garza be medically retired from the Army. (R. 619). However, *nowhere* in the ALJ's

opinion is there any mention of Dr. Strobel, and his opinion that Garza's symptoms are poorly controlled is flatly inconsistent with the ALJ's determination that Garza only suffers from mild to moderate symptoms.  It was error for the ALJ to disregard Dr. Strobel's opinion.

Next, the ALJ assigned great weight to the opinion of Garza's treating physician, Dr. Chatigny.  (R. 40).  However, he attributed to her an opinion that is not supported by her records.  The ALJ found that Dr. Chatigny found Garza's PTSD symptoms to be mild or moderate.  (R. 40).  This was clearly erroneous.  Dr. Chatigny was the physician who recommended that Garza be medically retired from the Army due to the severity of his PTSD and depression symptoms.

As noted throughout the court's recitation of the medical evidence, it is evident that the ALJ was antagonistic towards Garza, and he culled the record for selective references, ignoring comments that did not support his conclusions.  At one point in his opinion, the ALJ attacks Garza for applying for disability benefits.  "The undersigned must stress that the review or statement as to the severe and nonsevere impairments above, while lengthy, results not so much from limitation associated with this litany of impairments, but rather what the undersigned feels is the claimant's unabashed desire to procure compensation."  (R. 19). Social Security ALJs have a tough job.  The adjudicatory burden imposed on them by the Administration requires herculean efforts.  Thus, it is no wonder that they sometimes make mistakes.  And, the court has no doubt that some claimants exaggerate symptoms to improve

their chances to obtain benefits.  That said, the court cannot countenance ALJ Lassiter's insinuation that Garza was somehow improperly attempting to secure benefits.  Garza's military commanders, military physicians and his treating physicians all concluded that he had severe PTSD.  A person who is unable to work has a legal right to seek Social Security benefits, and no one, least of all an Administrative Law Judge, should fault them for pursuit of a legal right.

Because the ALJ failed to give great weight to the opinions of Garza's treating physicians, Dr. Chatigny and Dr. Strobel, and he failed to give great weight to the disability determination of other agencies, the court concludes that ALJ failed to apply the correct legal standards in this case.  The ALJ compounded his errors by culling the record to select only those entries that supported his determination.  Finally, due to the ALJ's hostility and antagonism, the court concludes Garza was denied fair, full and impartial evaluation of his claim.  *See Miles*, 84 F.3d at 1400.

Dr. Strobel, Dr. Chatigny, Dr. Rorie and Dr. McAlister all opined at different times that Garza's PTSD and depression were moderate to severe and resistance to treatment.  Even Dr. King opined that Garza would have difficulty responding appropriately to supervisors and co-workers.  (R. 1291).  At the administrative hearing, the ALJ asked the vocational expert about an individual's ability to respond to supervision.  This is what the vocational expert said.

> Q:   If this individual could not respond appropriately to even occasional supervisor, would there be full-time work available?

31

A:     No, sir. Again the number one reason people do not keep jobs is they do not receive supervision, constructive supervision or supervision appropriately and/or do not get along well with coworkers.

Q:     All right.  And that was going to be my next question.  If this individual could not interact with coworkers even occasionally, would there be full-time work for such individual?

A:     No, sir, that would preclude work.

(R. 74)

Because there is objective medical evidence in the record from his treating physicians that demonstrates that Garza could not respond appropriately to supervision or co-workers in the work place, based on the testimony of the vocational expert the court concludes that Garza is disabled and entitled to an award of benefits.  Thus, it is appropriate to reverse the decision of the Commissioner so that benefits may be awarded to the plaintiff.  *See Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993) (reversal with award of benefits appropriate where the Commissioner has already considered the essential evidence and it is clear that the evidence establishes disability without any doubt).  *See also Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988) ( failure to apply the correct legal standards is grounds for reversal and an award of benefits).

## V.  Conclusion

Accordingly, for the reasons as stated, the decision of the Commissioner will be reversed and the case remanded to the Commissioner with instructions that benefits be awarded to the plaintiff.

A separate order will issue.

It is further

ORDERED that, in accordance with *Bergen v. Comm'r of Soc. Sec*., 454 F.3d 1273, 1278 fn. 2 (11th Cir. 2006), the plaintiff shall have **sixty (60)** days after he receives notice of any amount of past due benefits awarded to seek attorney's fees under 42 U.S.C. § 406(b). *See also Blitch v. Astrue*, 261 Fed. App'x 241, 242 fn.1 (11th  Cir. 2008).

Done this 13th day of September, 2016.

　　　　　　　　　　　　/s/Charles S. Coody
　　　　　　　　　　　CHARLES S. COODY
　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE